MEACHAM *v.* MID-SOUTH COTTON GROWERS ASSOCIATION.

4-5051

Opinion delivered April 25, 1938.

W. G. *Dinning*, for appellants.

*Peter A. Deischand, Brewer & Cracraft,* for appellees.

DONHAM, J. The appellants, being cotton growers in Phillips county, Arkansas, shipped sixteen bales of cotton from Mellwood in said county to Helena. Said cotton was consigned to the shippers with direction to notify Mid-South Cotton Growers' Association. This shipment was made on October 2, 1932. Upon arrival at Helena, the carrier, Missouri Pacific Railroad Company, delivered said cotton to the Federal Compress & Warehouse Company, one of the appellees.

J. L. Anderson had for several years been the manager of the Mid-South Cotton Growers' Association and was in charge of its affairs at Helena until the end of the preceding cotton season; but on January 30, 1932, his connection with it ceased. He had no connection with said association at any time afterward.

When the Federal Compress & Warehouse Company received the cotton from the shipper, it issued negotiable warehouse receipts for same, payable to the bearer, and held same from the time the cotton was received in the early part of October, 1932, until January 10, 1933, when it delivered same to the said J. L. Anderson. After Anderson's connection with the Mid-South Cotton Growers' Association ceased, he continued in the cotton business on his own personal account. W. L. Meacham, one of the appellants, two or three months after he had shipped the cotton, learned that the Mid-South Cotton Growers' Association had ceased to do business in Helena; and since he had consigned his cotton to said association, he began

to make inquiry as to what had become of the cotton. Someone had told him that the said J. L. Anderson could tell him where the cotton was; and he went to Anderson and told Anderson to find the cotton for him. He testified that this was about January, 1933. Later, Mrs. Eva Clyde Meacham, wife of the said W. L. Meacham, both being appellants herein, saw the said Anderson and asked him if he had found the cotton. He told her that he had found it. Then W. L. Meacham saw Anderson and received the same information to the effect that Anderson had located the cotton. Notwithstanding the said Mid-South Cotton Growers' Association had gone out of business and the cotton of appellants had been located in possession of another party, the Federal Compress & Warehouse Company, W. L. Meacham testified that he took no action about the matter.

Meacham testified that when Anderson told him he had found the cotton, in pursuance of the request of the said Meacham to do so, he, Meacham, told Anderson that he would let him sell the cotton when the price got right. It was also shown that Mrs. Meacham saw Anderson later; and he reported to her that the price was not right and that it was not a good time to sell. The evidence as to what occurred between appellants and the said Anderson was sufficient to warrant the court in finding that Anderson became the agent of appellants, with authority to handle the cotton. Whatever prompted him to do so, W. L. Meacham told Anderson that he would let him sell the cotton when the price got right. This was at the time Anderson reported to Meacham that he had found the cotton. To use the exact words of the said Meacham, he said: "I told him that I appreciated it. and as a matter of courtesy, when the price got right I would let him sell it." Whether this vesting of authority in Anderson to sell the cotton was prompted by courtesy, as testified by Meacham, or by some other inducement, it is evident that Meacham gave Anderson authority to handle the cotton. The effect of what he said to Anderson amounted to authority on the part of Anderson to take charge of the cotton or the warehouse receipts therefor as a cotton factor, and to hold same until such time as

the market conditions were right and then to sell the cotton.

The taking of the cotton by appellee, Federal Compress & Warehouse Company, when it had been consigned to another, was an act of conversion. This occurred in the early part of October, 1932. Approximately three months later, January 10, 1933, the warehouse receipts were delivered to said Anderson by said compress company. Appellant, W. L. Meacham, testified that the delivery of these receipts was without authority. If so, certainly the taking of possession of the cotton by the said compress company and the delivery of the warehouse receipts to Anderson without authority amounted to a conversion; and all this occurred more than three years prior to the filing of the suit. Suit was filed February 15, 1936.

The warehouse receipts for the cotton were negotiable and passed the title to the cotton by delivery. Anderson, to whom these receipts were delivered, borrowed substantial sums of money from the appellee, Phillips National Bank of Helena, Arkansas, and pledged these negotiable warehouse receipts to the bank as collateral security for the loan. The bank sold the cotton and applied the proceeds to the payment of the storage charges on the cotton and the debt of Anderson to the bank. Suit was brought by the appellants to recover the value of the sixteen bales of cotton. The Federal Compress & Warehouse Company defended the suit on the ground that the alleged cause of action against it was barred by the statute of limitations. The Phillips National Bank adopted this plea and also defended on the further ground that it was a *bona fide* purchaser for value of the negotiable warehouse receipts and that no right alleged by appellants could be asserted against it. Anderson left Helena heavily indebted and no one seems to have known where he went.

The first question to be decided here is whether the statute of limitations was available to the Federal Compress & Warehouse Company as a defense against the alleged cause of action of appellants. As heretofore stated, the cotton was received by the compress company

during the early part of October, 1932. Although the cotton was consigned to the Mid-South Cotton Growers' Association, the compress company, without right, took the cotton when it arrived at Helena. There was no excuse for this taking. An official of the compress company testified that the competition between it and other companies was great; that it was the custom for the one who could get the cotton first to keep it; that the company did not pay much attention to the billing; that if the cotton was put on the compress company's track, it was unloaded whether consigned to the company or not; and that since the competition was keen, the company took what it could get. This testimony was given by Al Haraway, superintendent of the compress company. It furnished no excuse whatever for the taking of the cotton, since it had been consigned to the Mid-South Cotton Growers' Association.

About three months later, same being on January 10, 1933, the compress company delivered the warehouse receipts to the said J. L. Anderson. This amounted to a conversion of the property. The statute of limitations was a bar to the cause of action against the compress company after three years from the time the cause accrued. No action was taken by appellants until more than three years after the taking of the property by the compress company and the delivery of the warehouse receipts to Anderson. If the delivery of these receipts to Anderson was without authority, as testified by appellant, W. L. Meacham, this certainly amounted to a conversion of the property for which an action might have been brought immediately, and from which time the statute of limitations began to run. Meacham had already told Anderson to locate the cotton for him, and Anderson had done so. Even on the theory that the relationship of bailor and bailee existed between appellants and the compress company, the act of turning over these negotiable warehouse receipts to a party not authorized to receive them was an act inconsistent with this relationship and amounted to an abandonment of same. These warehouse receipts entitled the one who possessed them to the possession of the cotton. The delivery of these receipts to one not entitled to receive them was a renunciation of the relation-

ship of bailor and bailee, if such existed, and was as much a severance of that relationship as if the cotton itself had been wrongfully delivered. The statute of limitations certainly began to run as of the date the receipts were delivered.

In the case of *Chapman* v. *Hudson*, 46 Ark. 489, Chief Justice COCKRILL, speaking for the court in regard to the delivery of property to one not entitled to receive it, said:

"This conduct was inconsistent with his right as bailee and was an abandonment of it. It was a conversion of the property, and is likened, by the authorities, to a destruction of it, and put an end to the contract of bailment, and the owner's right to take possession of the property or to recover damages for the tort accrued immediately upon the commission of the act."

If the trial court had desired to base its finding, upon which it dismissed the complaint of appellants for want of equity, on the theory of laches on the part of appellants, we believe the record furnishes evidence upon which it might have done so. Appellant, W. L. Meacham, found out within a few months after the cotton was shipped to the Mid-South Cotton Growers' Association that said association had gone out of business in Helena and that Anderson no longer represented said company, nor had any connection with it. This was enough to put him upon inquiry as to his cotton, and, as a matter of fact, did put him upon inquiry, for he went to Anderson and asked Anderson to locate the cotton. Anderson did locate it and informed both appellant, W. L. Meacham, and his wife, Eva Clyde Meacham, that he had located it. It is inconceivable that they did not make inquiry of Anderson as to the whereabouts of the cotton. Anderson knew where the cotton was, and, no doubt, told appellants where it was. In fact, as shown by the record, he went to the compress company and received the warehouse receipts on January 10, 1933, just three months and eight days after the cotton was shipped by appellants. It is not reasonable to suppose that appellants permitted the cotton to remain in the possession of the compress company and did not know where their warehouse receipts were. If they did not know, they could have found

out by making inquiry. We believe the circumstances were such as should have put them upon inquiry, not only as to the location of the cotton, but as to the disposition of the warehouse receipts. If it was not agreeable to appellants that Anderson should have possession of the warehouse receipts, they could have proceeded against Anderson to recover them, or, if he had disposed of them, they could have proceeded to recover the value of the cotton. The fact that appellants did not take such course leads strongly to the belief that they regarded Anderson as their agent. Another fact disclosed by the record which tends to show that appellants regarded Anderson as their agent to handle the cotton was that they never became concerned until Anderson absconded and left the country. Immediately after they had learned that Anderson had left the country, they began to make inquiry and filed the suit involved in this appeal. In the meantime, the old manager of the compress company had gone, as was the employee who had delivered the warehouse receipts to Anderson. If they had been available as witnesses, the compress company might have been able to show by them that the delivery of the receipts to Anderson was in all respects regular. Owing to the change in the personnel of the employees of the compress company, and owing to the inability of the company to produce these employees as witnesses, and owing to the further fact that Anderson had left the country and could not be located, it was not definitely known why the warehouse receipts had been delivered to Anderson.

In the case of *Norfleet* v. *Hampton*, 137 Ark. 600, 209 S. W. 651, this court, speaking through Mr. Justice Hart, said:

"The doctrine of laches is founded on the equitable maxims of 'he who seeks equity must do equity' and 'equity aids the vigilant.' Hence while there is a great variety of cases in which the equitable doctrine is invoked, each case must depend upon its own particular circumstances, and courts of equity have always discouraged laches and delay without cause. Of course, delay without neglect, or which does not operate to the prejudice of the rights of the opposite party is not suf-

ficient to constitute laches. It is well settled, however, that he, who, without adequate excuse delays asserting his rights until the proofs respecting the transaction out of which he claims his rights arose are so uncertain and obscure that it is difficult for the court to determine the matter, has no right to relief. So where on account of delay the adverse party has good reason to believe that his alleged rights are worthless or abandoned, where because of the change in condition or relations of the property and parties during the period of delay it would be an injustice to allow the complainant to assert his rights, or in case of intervening equities, it is generally held that laches is a bar to the relief sought." Citing, *Casey* v. *Trout,* 114 Ark. 359, 170 S. W. 75; *Finley* v. *Finley,* 103 Ark. 58, 145 S. W. 885; *Tatum* v. *Arkansas Lumber Co.,* 103 Ark. 251, 146 S. W. 135; *Davis* v. *Harrell,* 101 Ark. 230, 142 S. W. 156; *Rhodes* v. *Cissell,* 82 Ark. 367, 101 S. W. 758; *Williams* v. *Bennett,* 75 Ark. 312, 88 S. W. 600, 112 Am. St. Rep. 57; *Thomas* v. *Sypert,* 61 Ark. 575, 33 S. W. 1059; and *Gibson* v. *Herriot,* 55 Ark. 85, 17 S. W. 589, 29 Am. St. Rep. 17.

As to the alleged cause of action against the Phillips National Bank of Helena, as hereinabove stated, the bank not only pleaded the statute of limitations, but also defended on the ground that it was a *bona fide* purchaser for value of the negotiable warehouse receipts which had been issued to the Mid-South Cotton Growers' Association, or bearer, and that the alleged rights of appellant, therefore, could not be asserted against it. It was shown by B. L. Ross, president of the bank, that he had no knowledge of any defect in the title of Anderson. He testified that it was of no importance that the receipts were made to a party named in the receipts, if they were also made to bearer; and that the bank made many loans on warehouse receipts issued to a party named therein, or bearer, without regard to the party to whom they were issued. He testified that the loan to Anderson was made in good faith; that the receipts were handled in the customary way; and that at the time Anderson was considered a reputable cotton man of Helena. As heretofore stated, these receipts were negotiable warehouse receipts, pro-

viding for the delivery of the cotton to the bearer of same. It is conceded by appellants that those receipts were negotiable and passed legal title to the cotton represented by them, by delivery without indorsement or other authorization. An allegation to this effect is contained in the complaint.

The record is clear that appellants agreed to let Anderson sell the cotton "when the price was right." There is sufficient evidence of agency on the part of Anderson that the court might have found that possession of the warehouse receipts by Anderson was not altogether without authority. If he was the agent of appellants for the sale of the cotton, we see no reason why he should not have possession of the receipts. As stated, the bank had no notice of lack of authority on the part of Anderson; and when it dealt with Anderson in regard to the cotton for which these receipts had been executed, it acted in good faith and without notice of adverse claims on the part of appellants or anyone else. Under the circumstances disclosed by this record, the bank had a right to deal with Anderson as it did with reference to these warehouse receipts. Sections 14417 and 14449, Pope's Digest.

It follows from what we have said that the decree of the trial court in dismissing the complaint of appellants must be affirmed. It is so ordered.